USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___4/7/2023___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAY SANTANA and BRENDAN DUFFY,

               Plaintiffs,

    -against-

MOUNT VERNON CITY SCHOOL
DISTRICT/BOARD OF EDUCATION;
KENNETH HAMILTON, Superintendent of
Schools; DENISE GAGNE-KURPIEWSKI,
Assistant Superintendent for Human
Resources; FELICIA GAON, Director of
Student Services; RONALD GONZALEZ,
Mount Vernon High School Principal;
PAULINE PALMER-PEARCE, Mount
Vernon High School Assistant Principal;
ERICA NAUGHTON, Mount Vernon High
School Mathematics Department Supervisor;
SATISH JAGNANDAN, District Supervisor
of Mathematics and Science,

               Defendants.

20-cv-3212 (NSR)

AMENDED OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge:

      Plaintiffs Raymond Santana ("Santana") and Brendan Duffy ("Duffy" and, together with

Santana, "Plaintiffs"), initiated this action on April 23, 2020 alleging violations of the Americans

with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), the Age Discrimination in Employment Act of

1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and N.Y. Executive Law § 296 ("NYSHRL"), against

the Mount Vernon City School District and Board of Education (the "District"), Superintendent of

Schools Kenneth Hamilton, Assistant Superintendent for Human Resources Denise Gagne-

Kurpiewski, Director of Student Services Felicia Gaon, Mount Vernon High School Principal

Ronald Gonzalez, Mount Vernon High School Assistant Principal Pauline Palmer-Pearce, Mount

Vernon High School Mathematics Department Supervisor Erica Naughton, and District Supervisor

of Mathematics and Science Satish Jagnandan (collectively, "Defendants"). (Complaint, ECF No.

1.)  In an Opinion & Order dated September 30, 2021 ("First Opinion & Order") (ECF No. 43), this Court granted in part and denied in part Defendants' motion to dismiss Plaintiffs' Complaint. This Court denied Defendants' motion to dismiss Plaintiff Santana's ADA claims for failure to accommodate and retaliation.  (*Id.*)  This Court dismissed Plaintiffs' remaining claims without prejudice, granting Plaintiffs leave to replead their dismissed claims in an Amended Complaint. (*Id.*)  Plaintiffs filed an Amended Complaint on November 30, 2021 ("Am. Compl.") (ECF No. 44), and Defendants now move to dismiss all claims other than Plaintiff Santana's ADA claims for failure to accommodate and retaliation (ECF No. 54).

Presently before the Court is Defendants' motion to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*Id.*)  For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are derived from the Amended Complaint and the documents appended thereto and are assumed to be true for the purposes of this motion.  Although the facts alleged in the Amended Complaint bear resemblance to the facts alleged in the original Complaint, for the sake of clarity this Court outlines below the facts as alleged in the Amended Complaint.

### I.    *Ray Santana*

Santana is a 65-year-old, disabled Vietnam war veteran who previously served in the U.S. Air Force.  (Am. Compl. ¶ 17.)  While serving in the Air Force, on September 23, 1975, Santana injured his left knee.  (*Id.* ¶ 18.)  He was honorably discharged from service due to his injuries, and he was later classified by the U.S. Veterans' Administration with dysthymic disorder.  (*Id.* ¶ 19.)

Beginning in September 2001, Santana worked for the Mount Vernon City School District as a technology teacher, special education teacher, and library media specialist.  (*Id.* ¶ 20.)  He

obtained permanent certifications from the New York State Department of Education for elementary education and special education, as well as certification as a school media specialist. (*Id.* ¶¶ 21–22.)  On December 8, 2011, Santana sustained additional injuries to his left knee while breaking up a fight between students.  (*Id.* ¶¶ 18, 44.)  From September 6, 2016 to June 24, 2017, Santana served as a school librarian and media specialist at the District's Mandella Zollicoffer Alternative High School.  (*Id.* ¶ 23.)  On multiple occasions, Santana was praised for his work as a school librarian, where he also received a "glowing" letter of recommendation from his supervisor.  (*Id.* ¶¶ 24–26.)

In September 2017, due to a program reduction, the District assigned Santana to work as a special education teacher at Mount Vernon High School despite Santana's request that he remain in a librarian position.  (*Id.* ¶ 27.)  Instead of granting Santana's request, the District hired "several new librarians who were at least 10 years younger" than Santana, including librarians who are aged 28, 28, 32, 46, and 48, respectively.  (*Id.* ¶ 28.)

When he reported to his new position in September 2017, Santana found that he was assigned to a room filled with trash and missing chairs, desks, computers, and a blackboard.  (*Id.* ¶ 29.)  Given these issues, he reached out to Defendant Gonzalez about the missing furniture, but Gonzalez did not respond.  (*Id.* ¶ 30.)  Santana followed up several days later by email, to which Gonzalez replied, "You are expected to deliver instruction to your students. You do not need a teacher's desk to provide instruction."  (*Id.* ¶ 31.)

On September 20, 2017, Santana met with Defendant Hamilton regarding Santana's employment status.  (*Id.* ¶ 32.)  They discussed the conditions of Santana's classroom, and Hamilton called Gonzalez to discuss Santana's complaints.  (*Id.*)  Hamilton then informed Santana that Gonzalez wanted to see Santana in his office.  (*Id.*)  Santana met with Gonzalez, who was in "an extremely agitated state," "berating" Santana for teaching in the wrong room.  (*Id.* ¶ 33.)  When

Santana showed Gonzalez the paperwork that assigned him to the room he was using, Gonzalez told him to use a different room instead.  (*Id.*)

In September 2018, Santana was assigned "five non-regents mathematics courses as the special education teacher at Mount Vernon High School."  (*Id.* ¶ 37.)  Although Gonzalez was aware of Santana's work-related injuries, Gonzalez and Defendants Palmer-Pearce and Naughton assigned him approximately 186 students over five periods of the school day, averaging 37 students per class.  (*Id.* ¶ 39.)  A typical class consists of 24 students.  (*Id.* ¶ 40.)  Four of the five classes were non-compliant with New York State special education regulations because they each consisted of more than twelve special needs students (or over one quarter of each class consisted of special needs students).  (*Id.*)  Santana emailed Gonzalez, Palmer-Pearce, and Naughton multiple times requesting a reduction in student class size, but they took no action. (*Id.* ¶¶ 42–43.)  Additionally, Santana's injury prevented him from using the stairs, so he could not retrieve the statistics textbooks needed for one of the classes.  (*Id.* ¶ 43.)

In November 2018, Santana underwent knee replacement surgery as a result of his prior injury.  (*Id.* ¶ 44.)  He was out of work from November 1, 2018 to March 15, 2019. (*Id.*) When he returned, his assigned workload remained virtually unchanged.  (*Id.* ¶ 45.)  From March 15, 2019 through June 12, 2019, Santana sent a total of ten emails to Defendant Palmer-Pearce, detailing nineteen days where no teaching assistance was provided.  (*Id.* ¶ 47.)

On March 18, 2018 and again on October 8, 2019, Santana requested several accommodations by completing and filing documents with the District's Human Resources Department and Gonzalez. (*Id.* ¶¶ 56.) The forms were filled out by Santana's primary physician and included requests for (1) no stair climbing; (2) repositioning every 10-15 minutes; (3) no prolonged sitting or standing; (4) ergonomic seating; (5) the use of a cane for assistance with locomotion; and (6) placement with students with stable behavioral outlooks. (*Id.* ¶¶ 57–58.)

Santana also sought accommodations as a "disabled Vietnam Veteran" based on a letter from the Director of the Danbury Veterans' Center, requesting (1) ergonomic seating; (2) additional time for reports; (3) voice to text assistance; (4) quiet area during authorized break; and (5) supportive staff when available.  (*Id.* ¶ 59.)  Santana did not receive any of the requested accommodations.  (*Id.* ¶¶ 57, 59.)  On April 1, 2019, Santana filed a discrimination charge with the New York State Division of Human Rights ("SDHR") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging disability and age discrimination and retaliation.  (*Id.* ¶ 48.)

On June 8, 2019, Santana was scheduled to proctor an exam on the second floor.  (*Id.* ¶ 50.)  After informing Gonzalez that he could not access that floor, a school safety officer was sent to his classroom to ensure Santana attended to his proctoring duties.  (*Id.*)  Through a walkie-talkie, Gonzalez demanded Santana proctor the exam.  (*Id.*)  Santana was forced to use the stairs, which caused him pain.  (*Id.*)  Santana also claims he was not accommodated as the District did not consider him for a more sedentary, librarian position.  (*Id.* ¶ 51.)

Santana was assigned to teach special education classes for the 2019–2020 school year. (*Id.* ¶ 53.)  At this time, Santana was recovering from left hip replacement surgery, which was made necessary by Santana's knee injury.  (*Id.* ¶ 52)  On the first day of school, Gonzalez changed Santana's class schedule so that Santana would teach lower functioning special needs and alternative education students.  (*Id.* ¶ 54.)  On October 9, 2019, Santana presented Gonzalez with a letter from his physician requesting that Santana be placed with students with stable behavior outlooks to reduce Santana's risk of injury.  (*Id.* ¶ 57.)  Gonzalez refused to amend Santana's schedule.  (*Id.*)  Then, on October 10, 2019, Palmer-Pearce informed Santana that the Sundown Academy would schedule him as a resource room teacher for part of the school day.  (*Id.* ¶ 60.) The Sundown Academy is a segregated learning program within the high school for students with "particular unstable emotional behavioral issues and academic deficiencies." (*Id.*)

On October 17, 2019, Santana began to send emails to Gonzalez and Palmer-Pearce discussing the "hostile and unsuitable educational environment" of one of his classrooms that contained broken desks, chairs, and computers, as well as piles of trash. (*Id.* ¶ 61.)  He also sent Gonzalez and Palmer-Pearce photographs of his classroom. (*Id.*)  Additionally, he was denied a key to access one of his classrooms, and as a result he and his class had to wait in the hallway until someone came to unlock it. (*Id.*)

On November 4, 2019, Santana was notified by the District's Human Resources Division that his accommodation requests were deemed unreasonable. (*Id.* ¶ 62.)  He received an email from Defendant Gaon summarizing why this decision was made, including "threats of disciplinary action" "alleging insubordination" for "not properly performing his job duties." (*Id.* ¶ 63.)

On January 6, 2020, Santana's classroom had a "very strong" chlorine smell. (*Id.* ¶ 64.) Upon inspection, Santana observed a white film across the classroom's chairs and desks. (*Id.* ¶ 65.)  As a result of this incident, Santana developed respiratory problems and a severe headache. (*Id.*)  Santana eventually received an email from the District's attorney stating the air quality test run 29 days after the chlorine incident showed no airborne contaminants and therefore the matter was closed. (*Id.* ¶ 68.)

On January 8, 2020, Gonzalez changed Santana's classroom assignment, which resulted in Santana traveling between three rooms each day. (*Id.* ¶ 66.)  Additionally, on February 24, 2020, Gonzalez sent a disciplinary letter to Santana reprimanding him for missing a parent-teacher conference. (*Id.* ¶ 67.)  In response, Santana provided Gonzalez an email he sent to Palmer-Pearce indicating that he was ill that day, and he requested Gonzalez undo the disciplinary action. (*Id.*) Gonzalez did not respond to Santana's request. (*Id.*)

Santana requested and received a right to sue letter from the EEOC, dated January 28, 2020.  (*Id.* ¶ 69.)  Since filing the original federal complaint in this action on April 23, 2020, Santana alleges he has "suffer[ed] additional acts of retaliation."  (*Id.* ¶ 70.)

On April 12, 2021, Santana advised his special education supervisor that he was scheduled to undergo knee replacement surgery as a long-term consequence of his workplace injury sustained on December 8, 2011.  (*Id.* ¶ 71.)  A Human Resources officer responded to Santana, "admonishing" him "as to the timing of the knee revision surgery."  (*Id.*)  The officer's response "intimdate[d]" Santana and caused him "undue anxiety."  (*Id.*)  Later that month, the District "cut off" Santana's salary "without notice" and "under the guise that he had no sick days left in his sick bank."  (*Id.* ¶ 72.)  Observing that his pay stubs indicated "negative sick days which essentially had not changed from the beginning of December 2020," Santana demanded "an accounting of his sick day file as well as credits that should have been awarded to him due to his injuries."  (*Id.* ¶¶ 72–73.)  The District never responded.  (*Id.* ¶ 73.)

On September 7, 2021, Santana again requested an ergonomic chair, which was one of his prior accommodation requests.  (*Id.* ¶ 75.)  Although the District's attorneys indicated that Santana had already received an ergonomic chair (as well as two teaching assistants), Santana characterized the attorneys' statements as "false and misleading."  (*Id.*)  On October 8, 2021, Santana was "severely injured when he fell off the only chair provided to him in the classroom"—one which was neither "ergonomic" nor "safe."  (*Id.* ¶ 76.)  Because of his injuries, Santana "was not able to return to school for several weeks," and he remains "under the care of medical specialists who are actively helping him to recover from his injuries."  (*Id.*)  Santana reiterated his concerns about seating in a November 27, 2021 email to the District, in which he included a photo of the chair which caused his injuries.  (*Id.* ¶ 78.)  Santana also complained "there are not enough handicap

parking spaces" for the high school, and as a result, Santana has endured additional "physical pain." (*Id.* ¶ 77.)

## II.   Brendan Duffy

Duffy is a 56-year-old tenured mathematics teacher who began working for the District in August 2005. (*Id.* ¶¶ 79–80.) In January 2010, he had arthroscopic meniscus surgery to repair his right knee. (*Id.* ¶ 80.) He also sustained injuries to his neck and knees when he was attacked by students on October 17, 2013. (*Id.* ¶ 81.)

Duffy worked as a mathematics teacher at Mount Vernon High School for the 2010–2011 school year. (*Id.* ¶ 82.) In August 2010, he requested an accommodation for a classroom on the first floor. (*Id.*) In October 2010, Duffy was selected to participate in a technology training program on the second floor of the school. (*Id.* ¶ 83.) Duffy asked for an accommodation so he could attend the program, but he was told multiple times by the technology supervisor that it was not his job to accommodate Duffy, and therefore Duffy was unable to participate in the entire program. (*Id.*) On April 9, 2011, Duffy filed a formal complaint with the EEOC based on disability discrimination. (*Id.* ¶ 84.)

In September 2011, Gonzalez became principal, and moved the math department to the second floor. (*Id.* ¶ 85.) Duffy was placed in a ground-floor classroom with mold and live electrical wiring, away from his colleagues. (*Id.*) Duffy notified Gonzalez about these conditions, but nothing was done. (*Id.*) After approximately two months, Duffy was relocated to a different classroom. (*Id.* ¶ 86.) On November 3, 2011, Duffy noticed broken pieces of wood and shattered glass in his new room, which he removed for safety. (*Id.* ¶ 87.) In response, Duffy received a disciplinary letter for damaging school property. (*Id.* ¶ 88.)

On September 4, 2012, Gonzalez informed Duffy that he was being involuntarily transferred to A.B. Davis Middle School (the "Middle School"). (*Id.* ¶ 90.) At the Middle School,

Duffy was observed twelve times by the math department supervisor, in violation of the teacher observation policy. (*Id.* ¶ 90.) Duffy also received a disciplinary letter that falsely claimed he was not tenured. (*Id.* ¶ 91.) In response, a meeting was scheduled with union representatives, who informed the supervisor that she had violated Duffy's teachers' contract. (*Id.*) Additionally, throughout the year, Duffy was reprimanded for sitting on a radiator during cafeteria duty, which he needed to do to rest his leg. (*Id.* ¶ 92.)

At the beginning of the 2013–2014 school year, Duffy was assigned to a classroom on the second floor. (*Id.* ¶ 94.) He notified his union immediately but was left without a classroom for several days. (*Id.*) On September 20, 2013, Duffy submitted a harassment complaint to the District's Human Resources Department detailing the "hostile work environment" he was subjected to at the Middle School. (*Id.*) He did not receive a response until 2016. (*Id.*)

Duffy also was not informed of math department meetings. (*Id.* ¶ 93.) On September 24, 2013, Duffy went to sign into a math department meeting but noticed his name was marked "absent." (*Id.* ¶ 96.) His name was the only one with this marking. (*Id.*) Additionally, in October 2013, Duffy asked for a key to his classroom, but was refused. (*Id.* ¶ 97.)

On October 17, 2013, Duffy was assaulted by two students and sustained permanent injuries to his neck and knees. (*Id.* ¶ 98.) He filed claims and was granted workers' compensation. (*Id.*) Duffy was out of school from October 21, 2013 until the end of the 2013–2014 school year due to these injuries. (*Id.* ¶ 99.)

At the beginning of the 2014–2015 school year, Duffy was assigned a classroom on the third floor. (*Id.* ¶ 100.) Duffy was eventually given access to a school elevator. (*Id.*) On April 13, 2015, Defendant Jagnandan conducted an unannounced observation in a math class that Duffy was co-teaching. (*Id.* ¶ 101.) Although his co-teacher was in charge of teaching that day, it was Duffy who was described as "ineffective" and "developing." (*Id.*) On June 25, 2015, the principal falsely

reported that he observed Duffy on the last day of school, even though no students were in attendance. (*Id.* ¶ 102.)  Duffy received a final rating of "ineffective." (*Id.*)  Duffy appealed this rating, and the rating was eventually changed to "incomplete." (*Id.*)

For the 2015–2016 school year, Duffy was transferred back to Mount Vernon High School. (*Id.* ¶ 103.)  His assigned classroom "was never completely repaired" and was not a "viable teaching environment." (*Id.* ¶ 104.)  As a result, Duffy was assigned an additional classroom and had to travel between two different rooms all year. (*Id.*)

On June 6, 2016, Duffy received a letter response to his hostile work environment grievance against his former math supervisor for the 2012–2013 school year. (*Id.* ¶ 105.)  The District conducted an investigation and concluded harassment did not occur. (*Id.*)  The District, however, also concluded that the supervisor had engaged in "inappropriate verbal discourse" that would be addressed. (*Id.*)  Duffy received an "ineffective" annual teacher rating from Gonzalez, even though his students' test scores showed he should have received an "effective" rating. (*Id.* ¶ 106.)

Duffy returned to Mount Vernon High School for the 2016–2017 school year. (*Id.* ¶ 107.) On September 20, 2016, Defendant Naughton tried to put Duffy on a Teacher Improvement Plan ("TIP") even though this was not required based on his teaching skills. (*Id.* ¶ 108.)  A stabbing also occurred later during the school year, and Duffy and his students were unaware of the safety protocol due to a broken loudspeaker in Duffy's classroom. (*Id.* ¶ 109.)  Although Duffy had warned Gonzalez regarding the classroom's speaker system, Gonzalez never responded, "put[ting] . . . the safety of [Duffy's] students in jeopardy." (*Id.*)  In addition, from December 5, 2016 through January 23, 2017, Duffy was absent from work due to his neck and knee injuries. (*Id.* ¶ 110.) When he returned, he learned that the padlock on his closet door was cut at the direction of

administration.  (*Id.* ¶ 111.)  His class assignment was taken away, and he was made a substitute teacher.  (*Id.*)

On March 20, 2017, Duffy had a meeting with his union representative, Gonzalez, and Palmer-Pearce to discuss his "ineffective" rating for the 2015–2016 school year.  (*Id.* ¶ 112.) Gonzalez became "hostile" towards Duffy after Duffy requested to see the spreadsheet used to calculate his score.  (*Id.*)

On March 9, 2017, Duffy was assigned to take attendance at detention in a room with black mold and a foul odor.  (*Id.* ¶ 113.)  On April 3, 2017, Duffy was told by a security officer that administrators were instructing employees to "spy on" Duffy.  (*Id.* ¶ 114.)  Duffy also continued to have issues with evaluations.  In late April 2017, Naughton "fraudulently" reported that she had pre-observation meetings with Duffy that did not occur.  (*Id.* ¶ 115.)  Then, on May 12, 2017, a math supervisor from another high school conducted an unannounced formal observation of Duffy and rated him "ineffective" while Duffy was supervising students in detention.  (*Id.* ¶ 116.)  Duffy was rated "ineffective" for the 2016–2017 school year, but this was changed to "incomplete" upon appeal.  (*Id.* ¶ 117.)

Duffy again returned to Mount Vernon High School for the 2017–2018 school year.  (*Id.* ¶ 118.)  He had multiple items stolen out of his classroom during the year.  (*Id.* ¶ 119.)  Although he reported these missing items to Gonzalez, Palmer-Pearce, and Naughton, he was "ignored" and did not receive reimbursement.  (*Id.*)  He also continued to have multiple problems specifically with Gonzalez, including that Gonzalez (i) removed two math classes from Duffy's schedule and assigned him two financial management classes outside of his teaching license area; (ii) "harassed" Duffy for his workers' compensation documents and told him he had to use sick days to cover any absences due to workers' compensation time; (iii) intentionally withheld keys to the restroom from Duffy; (iv) "lied" at a meeting about Duffy's actions during a lockdown drill, later stating that

11

Duffy would receive a disciplinary letter and referring to Duffy as a "clown" in front of other employees; (v) told Duffy he was not allowed to schedule his formal observation and conducted a formal observation the same day of the pre-observation meeting, both of which are violations of the teachers' contract; (vi) interrupted Duffy's lunch during the observation by stating, "I tell you when you can eat lunch"; and (vii) "lied" during a meeting with a union representative by stating Duffy could not have the representative present and then proceeding to give Duffy low evaluative scores. (*Id.* ¶¶ 119, 121–126.) Duffy received an "ineffective" rating for the 2017–2018 school year, which was changed to an "incomplete" rating upon appeal. (*Id.* ¶ 126.)

At the beginning of the 2018–2019 school year, Duffy's math posters in his classroom were stolen. (*Id.* ¶ 128.) Defendant Naughton stated she would look into the theft, but she never got back to him. (*Id.*) Duffy was also denied his request to wear shorts, which he wears for medical reasons pursuant to a doctor's note, and he was assigned five, non-regents integrated co-teaching classes alongside Santana. (*Id.* ¶¶ 129–130.) As discussed *supra*, these classes exceeded the standard number of students per teacher and the proportion of students with disabilities. (*Id.* ¶ 131.) During Santana's work absence, the District did not provide Duffy with replacement teaching assistance and made no accommodations to provide Plaintiffs with their required textbooks. (*Id.* ¶¶ 132–34.) On January 29, 2019, Palmer-Pearce conducted a formal observation of Duffy and rated him "ineffective," even though his co-teacher was absent. (*Id.* ¶ 136.) Duffy also did not receive accommodations to proctor the Regents' exams in January 2019, which took place on the second floor. (*Id.* ¶ 135.)

Due to his injuries, Duffy missed work from April 1, 2019 until April 22, 2019. (*Id.* ¶ 137.) On Duffy's first day back, Palmer-Pearce conducted an unannounced formal observation, which violated a union contract provision, and she rated him "ineffective." (*Id.*) Duffy was rated

"ineffective" for the 2018-2019 school year, which was again reversed upon appeal and changed to "incomplete." (*Id.* ¶ 138.)

On September 4, 2019, Gonzalez called Duffy into a meeting and notified him verbally and in writing that he was being transferred to the Parker School. (*Id.* ¶ 139.) That same day, Duffy attended a meeting at the Parker School where he was assigned to teach mathematics in three second-floor classrooms. Although Duffy explained his disabilities and requested a ground-floor classroom as a reasonable accommodation for his mobility limitations, Principal Natalie Dweck denied his request. (*Id.* ¶ 140.) In light of his denied accommodation request, Duffy asked Dweck and Assistant Principal Albins for a current elevator certificate of inspection. (*Id.* ¶ 141.) Duffy also asked multiple times for the District's evacuation plan "in the event of a fire or an emergency where the elevator is out of service, not usable, or not an option." (*Id.*) The District did not respond to either of Duffy's requests. (*Id.*) From September 5, 2019 through November 15, 2019, Duffy taught classes between three different classrooms on the second floor. (*Id.* ¶ 142.) As a result of this schedule, Duffy aggravated his pre-existing injuries and was forced to take off work from November 18, 2019 through March 27, 2020. (*Id.* ¶ 143.)

Duffy filed a charge of discrimination against the District with the EEOC on January 23, 2020, based on discrimination, retaliation, and an ongoing hostile work environment. (*Id.* ¶ 144.) He received a right to sue letter dated February 15, 2020. (*Id.* ¶ 145.) He then commenced the instant federal lawsuit on April 23, 2020. (*Id.* ¶ 148.)

Duffy was cleared by his doctor and returned to work on March 30, 2020. (*Id.* ¶ 146.) From March 30, 2020 through June 17, 2020, Duffy worked full-time remotely due to the COVID-19 pandemic. (*Id.* ¶ 147.) Duffy, however, was not paid for days worked between March 30, 2020 and April 16, 2020. (*Id.*) Duffy contested this non-payment, but the District's payroll staff has refused to respond to Duffy's inquiries regarding non-payment. (*Id.*) Moreover, the District

reported only six months of service credit for the 2019–2020 school year to Duffy's retirement account, and the District also failed to restore Duffy's sick days to his "sick bank." (*Id.* ¶ 149.)

Duffy returned to the Parker School for the 2020–2021 school year, and he was greeted by new administrators who again assigned him to a second-floor classroom. (*Id.* ¶¶ 150–151.) Duffy requested an accommodation to work in a ground-floor classroom, but Principal Jacqueline Green and Assistant Principal Troy Newbey rejected his request. (*Id.* ¶ 151.) Duffy also requested a laptop and internet hotspot so he could work remotely. (*Id.* ¶ 153.) Whereas "teachers who were younger than him" were issued laptops and granted permission to work remotely, Duffy was "treated differently" and not granted such permission. (*Id.*) On September 16, 2020, while working in-person at the school, Duffy was infected by the COVID-19 virus. (*Id.* ¶ 154.) Duffy missed the next six months recovering from the virus—for which he was hospitalized in October 2020—and "his Workers' Compensation injuries." (*Id.* ¶ 155.) Upon his return to work in March 2021, Duffy again requested a laptop and hotspot to enable him to work remotely. (*Id.* ¶ 156.) He also requested permission to not wear a mask when teaching in-person. (*Id.*) The District denied both of Duffy's requests. (*Id.* ¶¶ 156, 158.) The District credited Duffy zero months of service for the 2020–2021 school year. (*Id.* ¶ 159.) Duffy also alleges he lost $23,968.75 in retirement savings "due to the District's failure to provide [him] reasonable accommodations." (*Id.*)

Duffy was back to work at the Parker School for the 2021–2022 school year, where he was again assigned to teach a second-floor classroom and subsequently denied an accommodation request for a ground-floor classroom. (*Id.* ¶ 160.) He also again requested permission to not wear a mask "due to cardiological medical reasons," *i.e.*, "cardiological paroxysmal supraventricular tachycardia and mitral valve prolapse syndrome." (*Id.* ¶¶ 162, 164.) In denying Duffy's latest request, Principal Green and Assistant Principal Newbey "spoke about [Duffy's] medical condition in the main entrance of the school which is a public space where a teacher's aide, a security officer,

and a custodian were a few feet away and could clearly hear the entire conversation." (*Id.* ¶ 164.) Prinicpal Green and Assistant Principal Newbey also did not allow Duffy to work remotely, as they had allowed "other younger District teachers" to do. (*Id.* ¶ 165.) As a result of the District's "failure to accommodate" Duffy's requests, Duffy has not worked since September 10, 2021 and thus has not "been paid for over fourteen months." (*Id.* ¶¶ 164–165.)

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiffs Santana and Duffy each bring claims pursuant to the ADA, ADEA, and NYSHRL for discrimination, retaliation, and hostile work environment. Defendants move to dismiss all of Plaintiffs' claims except for those this Court allowed to proceed in its previous opinion: Plaintiff

Santana's ADA claims for discrimination—in particular, failure to accommodate—and retaliation. Before turning to Plaintiffs' claims which Defendants now seek to dismiss, this Court assesses which of Plaintiffs' claims are time-barred.

### I.        Statute of Limitations

A plaintiff who wishes to bring a claim under the ADEA or ADA must first file an EEOC discrimination charge within 300 days of the date of the alleged unlawful practice.  *See Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325–29 (2d Cir. 1999); *Harris v. City of New York*, 186 F.3d 243, 247–48 (2d Cir. 1999).  If not filed within this timeframe, the claim is time-barred. *Staten v. City of New York*, No. 14 CIV. 4307(ER), 2015 WL 4461688, at *8 (S.D.N.Y. July 20, 2015) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)).

There is a "continuing violation" exception to the statute of limitations for discrimination claims.  *Harris*, 186 F.3d at 248.  The continuing violation doctrine states that if "a plaintiff has experienced a continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Washington v. County of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 349 (2d Cir. 2001)).  "To qualify as continuing, the claimed actions must not be 'discrete acts,' but 'repeated conduct' that 'occurs over a series of days or perhaps years.'" *Dash v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 238 F. Supp. 3d 375, 388 (E.D.N.Y. 2017) (quoting *Morgan*, 536 U.S. at 115).  Examples of discrete acts "include disparate disciplining, negative performance reviews, termination, failure to promote, and denial of a preferred job position," *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 50 (S.D.N.Y. 2019), as well as "disparate pay, denials of accommodation and performance evaluations," *McGuirk v. Swiss Re Fin. Servs., Corp.*, No. 14 Civ. 9516 (CM), 2016 WL 10683305, at *9 (S.D.N.Y. June 17, 2016).  "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism

do not amount to a continuing violation." *Zabar v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 6657 (PGG), 2020 WL 2423450, at *4 (S.D.N.Y. May 12, 2020) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)).

Here, Plaintiff Santana filed his EEOC complaint on April 1, 2019 (Am. Compl. ¶ 48), and Plaintiff Duffy filed his EEOC complaint on January 23, 2020 (*id.* ¶ 144). To the extent that Santana and Duffy make allegations that took place prior to June 5, 2018 and April 1, 2019, respectively, those allegations are untimely. In the First Opinion & Order, this Court concluded these untimely allegations do not amount to a "continuing violation" and cannot form the basis for an exception to the statute of limitations. (First Opinion & Order at 13–15.) The Court sees nothing in the Amended Complaint to disturb its ruling, but nonetheless offers a clarification. Although Plaintiffs argue that a series of reasonable accommodation denials—*e.g.,* library positions, classroom assignments—represent a "continuing chain and pattern of ill treatment" (Plaintiff's Opposition to Defendants' Motion to Dismiss ("Plf. Opp."), at 5, ECF No. 58), a review of Second Circuit caselaw shows "failure to accommodate claims are not continuing violations but discrete actions." *Kane v. Carmel Cent. Sch. Dist.*, No. 12 CV 5429 VB, 2014 WL 7389438, at *12 (S.D.N.Y. Dec. 15, 2014) (collecting cases); see *Morgan*, 536 U.S. at 114 (identifying "termination, failure to promote, denial of transfer, or refusal to hire" as "easy to identify" "discrete acts"). In other words, Plaintiffs' reasonable accommodation denials cannot resurrect the untimely allegations insofar as those allegations support a timely reasonable accommodation or retaliation claim. *See, e.g., Beharry v. City of New York*, No. 18-CV-2042 (AJN), 2019 WL 634652 (S.D.N.Y. Feb. 14, 2019) (barring acts of discrimination or retaliation "if a plaintiff does not file a charge of discrimination with the EEOC or a qualified state or local fair employment practice agency within 300 days after the alleged unlawful employment practice.") These time-barred allegations, however, can support a hostile work environment claim "[p]rovided that an act contributing to the

claim occurs within the filing period." *Morgan*, 536 U.S. at 117 (explaining that "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct"). As such, to the extent Santana and Duffy make allegations that took place prior to June 5, 2018 and April 1, 2019, respectively, the Court will consider these otherwise untimely allegations solely for the purpose of assessing Plaintiffs' hostile work environment claims. The Court will not consider these untimely allegations for the purpose of assessing Plaintiffs' discrimination or retaliation claims. *See Spence v. Bukofzer*, No. 15 CIV. 6167 (ER), 2017 WL 1194478, at *5 (S.D.N.Y. Mar. 30, 2017) (citing *Morgan*, 536 U.S. at 117) (agreeing to consider untimely allegations when assessing hostile work environment claim, but otherwise declining to consider same untimely allegations when assessing discrimination and retaliation claims). As such, this Court dismisses with prejudice any discrimination or retaliation claims arising out of allegations that took place prior to June 5, 2018, for Santana, or April 1, 2019, for Duffy.

## II.     ADA Reasonable Accommodation Claims

The ADA provides that, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer may violate the ADA by failing to provide a reasonable accommodation. A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that

> (1) Plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his [or her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

18

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009).   A reasonable accommodation to a disability is one that enables the employee "with a disability who is qualified to perform the essential functions of that position."   29 C.F.R. § 1630.2(o)(1)(ii).   A reasonable accommodation may include job restructuring, modified work schedules, reassignment to a vacant position, acquiring or modifying work equipment, or trainings and policies, among other things. 42 U.S.C. § 12111(9)(B).

In the First Opinion & Order, this Court denied Defendants' motion to dismiss as to Plaintiff Santana's ADA discrimination claims.   (First Opinion & Order at 16–18.)   In view of this Court's prior decision, Defendants do not move to dismiss Plaintiff Santana's ADA discrimination claims alleged in the Amended Complaint. [1]   (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss at 1 n.1, ECF No. 56.)   Instead, Defendants move to dismiss Plaintiff Duffy's ADA discrimination claims, which this Court previously dismissed in the First Opinion & Order.   (First Opinion & Order at 18.)

In its First Opinion & Order, this Court dismissed Duffy's ADA discrimination claims because none of his allegations were timely.   (*Id.*)   In the Amended Complaint, however, Duffy partially fixes this problem.   He alleges that on September 4, 2019, he attended a meeting at the Parker School, where he had been "involuntarily transferred."   (Am. Compl. ¶ 139.)   At the meeting, he "explained that he had to work in one classroom on the floor of the building at ground level as he could [not] go up or downstairs due to his Workers' Compensation injuries to his neck and bilateral knees sustained on October 17, 2013."   (*Id.* ¶ 140.)   Despite his request to work in one classroom on the school's ground floor, Principal Natalie Dweck rejected Duffy's request,

---

[1] As such, Santana may advance on any discrimination claims arising from allegations that took place on June 5, 2018 or later, including those arising after Santana filed his EEOC complaint on April 1, 2019, *see infra* at 20–22 (citing *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (allowing courts to consider unexhausted claims to the extent those unexhausted claims are "reasonably related" to the claims in an EEOC complaint)).

along with Duffy's ensuing requests for information on how to use the school's elevator in the event of an emergency. (*Id.* ¶¶ 140–41.) Although Duffy cloaks his allegations in passive language so as to render unclear *to whom* he requested this accommodation (*see id.* ¶ 140), he nonetheless provides information sufficient to show the date of his request, its contents, and the District's subsequent denial, including Principal Dweck and Assistant Principal Albins' involvement in the denial. Taken together alongside Duffy's numerous prior accommodation requests, the District had actual notice of Duffy's leg injuries which limited his mobility. *Colas v. City of Univ. of New York*, No. 17CV4825NGGJO, 2019 WL 2028701, at *4 (E.D.N.Y. May 7, 2019) (denying motion to dismiss, even where plaintiff did not specify who she made accommodation request to, because plaintiff had requested numerous accommodations and defendants had sufficient notice of plaintiff's disability). Moreover, Duffy is qualified to perform the essential functions of a math teacher, as evidenced by his tenured status and decades-long career as a math teacher in the District—including several years in which Duffy has taught despite his disabilities, *cf. Brown v. New York City Dep't of Educ.*, No. 20CV2424VECOTW, 2021 WL 4943490, at *10 (S.D.N.Y. Aug. 31, 2021) (granting motion to dismiss where plaintiff did not "plead any facts as to how or whether she was able to complete her job since the onset of her disability . . ., when she alleges that she began experiencing discrimination"), *report and recommendation adopted*, No. 20-CV-2424 (VEC), 2021 WL 4296379 (S.D.N.Y. Sept. 20, 2021). Common sense dictates that teaching in a classroom on the ground floor would not render Duffy any less qualified to perform the essential functions of a math teacher. As such, Duffy has stated a discrimination claim as to his September 2019 accommodation request.

Duffy also states a discrimination claim as to his accommodation requests for a ground-floor classroom in September 2020 and 2021. Ordinarily, "claims not raised in an EEOC complaint . . . may be brought in federal court if they are 'reasonably related' to the claim filed with the

agency." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006). An unexhausted claim is "reasonably related" to claims raised in an EEOC complaint where (1) "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) "the complaint is 'one alleging retaliation by an employer against an employee for filing an EEOC charge'"; or (3) "the complaint 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993)). Although Duffy's September 2020 and 2021 requests postdate his EEOC complaint, the requests are "reasonably related" to his EEOC complaint as they both "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination" and "allege further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *See Terry*, 336 F.3d at 151. As he was in 2019, Duffy was assigned to teach in a second-floor classroom and responded by requesting a ground-floor classroom to accommodate his limited mobility. (Am. Compl. ¶¶ 140, 151, 160.) The only difference between these requests is that they were directed to new administrators. Given that the requests are identical, it follows that any investigation into the 2019 accommodation request would likely have unearthed details of the 2020 and 2021 requests. *See Terry*, 336 F.3d at 151. Moreover, the District "carried out" its alleged discrimination in the "same manner alleged in the EEOC charge," *see id.*: (1) ignoring Duffy's known injury in assigning him to the second floor, and (2) denying his accommodation request for a ground-floor classroom. As such, Duffy states a discrimination claim insofar as he alleges the District denied his reasonable accommodation request for a ground-floor classroom during the 2020–2021 and 2021–2022 school years.

Duffy's other requests do not give rise to a discrimination claim.  Requests prior to April 1, 2019 are time-barred, as discussed *supra*, and thus cannot sustain a discrimination claim.  These time-barred claims are dismissed with prejudice.  In addition, pandemic-related requests, which were submitted by Duffy after he filed his EEOC charge, cannot sustain a discrimination claim as Duffy has failed to exhaust his administrative remedies.  These requests, such as Duffy's requests to not wear a mask or to work remotely, are not "reasonably related" to his mobility requests, discussed above, as Duffy's pandemic-related requests involve a different disability altogether.  *See Chandler v. AMR Am. Eagle Airline*, 251 F. Supp. 2d 1173, 1178 (E.D.N.Y. 2003) (citing *Butts*, 990 F.2d at 1402–03) (dismissing unexhausted failure to accommodate claim for plaintiff's prostate condition where accommodations for plaintiff's condition "differ significantly in kind and scope from those asserted in relation to plaintiff's back and leg injuries," which were the subject of plaintiff's EEOC complaint filed two years earlier).  Moreover, his requests could not "grow out of the charge of discrimination" filed in January 23, 2020 because few but the most prescient could have anticipated the spread of a global pandemic that would so transform a teacher's responsibilities and assignments.  *See id.* (citing *Butts*, 990 F.2d at 1402–03).  Duffy's discrimination claims are limited to the denial of his reasonable accommodation requests in September 2019, 2020, and 2021.  Duffy's pandemic-related discrimination claims are dismissed without prejudice.

### III.    ADEA Discrimination Claims

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  This protection covers "individuals who are at least 40 years of age."  *Id*. § 631(a).  To state an ADEA discrimination claim, a plaintiff must allege that (1) he or she was "within the

protected age group," (2) he or she was "qualified for the position," (3) he or she "experienced adverse employment action," and (4) "such action occurred under circumstances giving rise to an inference of discrimination." *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)). On a motion to dismiss, a court "need determine only 'whether the allegations in the complaint give plausible support to the reduced *prima facie* requirements that arise . . . in the initial phase of a litigation.'" *Miller v. Dep't of Educ.*, No. 17-CV-594 (JPO), 2018 WL 1468703, at *2 (S.D.N.Y. Mar. 23, 2018) (quoting *Dressler v. City Sch. Dist.*, No. 15-cv-3696 (JPO), 2016 WL 4367967, at *3 (S.D.N.Y. Aug. 15, 2016)). In general, a plaintiff must provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 484–85 (S.D.N.Y. 2017) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). "An inference of discrimination can arise from a variety of circumstances, including but not limited to, the employer's criticism of the plaintiff's performance in . . . degrading terms based on [his or] her protected characteristic; [] its invidious comments about others in the employee's protected group; [] the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Pustilnik v. Battery Park City Auth.*, No. 18-CV- 9446 (RA), 2019 WL 6498711, at *4 (S.D.N.Y. Dec. 3, 2019) (internal quotation and citation omitted).

Plaintiffs do not state age discrimination claims. Santana alleges the District hired, instead of him, "several new librarians who were at least 10 years younger." (Am. Compl. ¶ 28.) These allegations are untimely, as discussed *supra*, but even if they were not, Santana fails to allege how these new librarians were less qualified than him, *see Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d 301, 315–19 (S.D.N.Y. 2015) (dismissing ADEA claim where plaintiff failed to allege that position was filled "with a person significantly younger and/or less qualified than

Plaintiff" and did not include information about the younger candidates' respective qualifications), and the fact that two of the five librarians are also old enough to fall within the ambit of ADEA protection undercuts Santana's claims, *see, e.g., Spires v. MetLife Grp., Inc.*, No. 18-CV-4464 (RA), 2019 WL 4464393, at *8 (S.D.N.Y. Sept. 18, 2019) ("Although the ADEA does not necessarily foreclose an age-discrimination claim when a plaintiff was over forty years old when first hired, this substantially weakens any inference of discrimination on Defendants' part."). Duffy's allegations are likewise deficient. Duffy alleges younger teachers received more favorable reviews and assignments (*see generally* Am. Compl. ¶ 177), but he only identifies one such comparator and provides no information as to his comparator's age and their respective qualifications. Duffy also alleges younger teachers were allowed to work remotely and granted access to additional resources, such as a laptop and internet hotspot. (*Id.* ¶¶ 153, 165.) Duffy, however, proffers only conclusory allegations and does not provide any details about the other teachers who were allowed to work remotely and their respective qualifications and responsibilities relative to Duffy. *See Ndremizara*, 93 F. Supp. 3d at 316 (characterizing plaintiff's allegation that he "discovered that many entry level candidates selected or hired by [Defendant] were younger and less qualified than [him]" as "conclusory, naked, and devoid of further factual enhancement" (internal quotations omitted)). In addition, neither Plaintiff puts forth any statements by Defendants (or even non-parties) to suggest the alleged discrimination was at all motivated by Plaintiffs' respective ages. *See Arciuolo v. Tomtec Inc.*, No. 3:14-CV-00624 (JAM), 2015 WL 6384598, at *3 (D. Conn. Oct. 22, 2015) (dismissing ADEA claim where "plaintiffs' claims of age discrimination are wholly conclusory and bereft of any connection to allegations of specific statements or acts by any defendant"). As such, Plaintiffs' claims for age discrimination are dismissed with prejudice.

### IV.   ADA and ADEA Retaliation

It is well settled that retaliation claims under the ADEA and ADA are analyzed under the same framework. *Smith v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 8545 (PGG), 2019 WL 6307471, at *11 (S.D.N.Y. Nov. 25, 2019). For a retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action— against [him or her], (2) 'because' he [or she] has opposed any unlawful employment practice." *Riddle v. Citigroup*, 640 F. App'x 77, 79 (2d Cir. 2016) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)). In the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). This is broader than the adverse action element of employment discrimination claims. *Moore v. Consol. Edison Co. of N.Y., Inc.*, No. 00 Civ. 7384(PAC), 2007 WL 831807, at *6 (S.D.N.Y. Mar. 20, 2007).

To plead causation, a plaintiff must allege "that his [or her] protected activity was the but-for cause of the adverse employment action." *Ninying v. N.Y.C. Fire Dep't*, 807 F. App'x 112, 115 (2d Cir. 2020). At this stage, "a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her [or his] protected activity and the materially adverse action that she [or he] allegedly suffered in retaliation for engaging in that activity." *Wang v. Palmisano*, 157 F. Supp. 3d 306, 327 (S.D.N.Y. 2016). Although there is no bright line rule "to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), the "temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). To that end, "courts in this Circuit generally hold that a gap longer than two months severs the inferred causal relationship." *Graham v. Macy's, Inc.*, No. 14 Civ. 3192 (PAE), 2016 WL 354897, at *9 (S.D.N.Y. Jan. 28, 2016); *see also Knox v. Town of Southeast*, No. 11 Civ.

8763(ER), 2014 WL 1285654, at *11 (S.D.N.Y. Mar. 31, 2014) ("Indeed, many of the decisions in this Circuit that have addressed the issue have held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.").

In assessing Plaintiffs' retaliation claims, the Court will focus only on conduct that occurred after the alleged protected activity.  *See Laface v. Eastern Suffolk BOCES*, 349 F. Supp. 3d 126, 150 (E.D.N.Y. 2018) (holding that there can be no retaliation for an ADA retaliation claim where the adverse action occurred prior to the protected activities).  As discussed *supra*, this Court will not consider Duffy's retaliation claims to the extent they arise from conduct occurring prior to April 1, 2019.  This Court, however, will consider Duffy's retaliation claims insofar as they arise from conduct occurring after Duffy filed his EEOC complaint on January 23, 2020.  These claims are "reasonably related" to the claims in Duffy's EEOC complaint—and thus need not be administratively exhausted—because they allege "retaliation by an employer against an employee for filing an EEOC charge."  *See Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003).

Nonetheless, Duffy fails to state a retaliation claim.  As this Court observed when it previously dismissed Duffy's retaliation claims, Duffy "fails to plead causation" (First Opinion & Order at 24), leaving the Court no basis upon which to infer the Defendants' alleged retaliatory conduct was motivated primarily—let alone at all—by Duffy's filing of an EEOC complaint or federal lawsuit.  Duffy fails to map a causal connection between any adverse action and his protected activity, *see Ninying v. New York City Fire Dep't*, 807 F. App'x 112, 115  (2d Cir. 2020) (affirming lower court's dismissal of retaliation claim where plaintiff failed to allege plaintiff's protected activity was the "but-for cause" of the adverse employment action), and even if he did, a number of factors would dilute the strength of that connection, including (1) adverse actions which took place both before and after protected activity, *see Pinero v. Long Island State Veterans*

*Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)), and (2) the lack of temporal proximity between Duffy's EEOC complaint and the alleged retaliatory activity, *e.g.*, alleged denials of reasonable accommodations in September 2020, March 2021, and September 2021, which took place several months later, *see Langella v. Mahopac Cent. Sch. Dist.*, No. 18-CV-10023 (NSR), 2020 WL 2836760, at *11 (S.D.N.Y. May 31, 2020) ("To that end, courts in this Circuit generally hold that a gap longer than two months severs the inferred causal relationship." (internal quotations and citations omitted)). Accordingly, Duffy's retaliation claims are dismissed with prejudice.

## V.      ADA and ADEA Hostile Work Environment Claims

An ADEA hostile work environment claim is governed by the same standards applicable to hostile work environment claims under the ADA. *Murtha v. New York State Gaming Comm'n*, No. 17 CIV. 10040 (NSR), 2019 WL 4450687, at *12 (S.D.N.Y. Sept. 17, 2019). To plead a *prima facie* hostile work environment claim, a plaintiff must plead "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of his [or her] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (internal quotation marks omitted). "This standard has both objective and subjective components: the conduct complained of must be 'severe or pervasive enough' that a reasonable person would find it hostile or abusive, and the victim must also subjectively perceive the work environment as abusive." *O'Hara v. Bd. of Coop. Educ. Servs.*, No. 18-CV-8502 (KMK), 2020 WL 1244474, at *14 (S.D.N.Y. Mar. 16, 2020) (citing *Fox*, 918 F.3d at 74.)

Additionally, a plaintiff must also allege that the conduct created such an environment "because of" his or her disability. *Id.* The Court must evaluate the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it [was] physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiffs'] work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).

At the outset, denials of reasonable accommodations alone cannot sustain a hostile work environment claim.  *See Murtha v. New York State Gaming Comm'n*, No. 17 CIV. 10040 (NSR), 2019 WL 4450687, at *13 (S.D.N.Y. Sept. 17, 2019) ("[A] defendant's failure to provide a reasonable accommodation does not in itself constitute evidence of a parallel claim for discriminatory termination or hostile work environment." (citing *Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018)); *see also Greenbaum v. New York City Transit Auth.*, No. 20CV771 (DLC), 2021 WL 2650509, at *11 (S.D.N.Y. June 25, 2021) (dismissing hostile work environment claim because failure to provide plaintiff with an ergonomic keyboard constituted a failure to accommodate a disability, not a hostile work environment), *reversed on other grounds*, No. 21-1777, 2022 WL 3347893 (2d Cir. Aug. 15, 2022).  Aside from these denials, none of Plaintiffs' other allegations allow an inference that the allegedly abusive environment was "because of" Plaintiffs' disabilities or ages.  *See O'Hara*, 2020 WL 1244474, at *14.  Plaintiffs allege, among other things, they were subject to negative reviews, assigned to teach classes with excessive numbers of students, denied much-need resources and support, issued occasional verbal or written reprimands from District officials, and transferred between District schools.  (*See, e.g.,* Plf. Opp. at 15–19)  Plaintiffs undoubtedly "perceive the work environment as abusive," *O'Hara*, 2020 WL 1244474, at *14, and this Court acknowledges their experience—as alleged—may impose burdens upon Plaintiffs beyond that of teachers in other districts.  Plaintiffs, however, do not show how their experience differs from that of other teachers in the District, who may be similarly positioned with few resources to meet excessive demands on their time and energy.  More importantly, Plaintiffs do not show how the District's work environment—assuming it is abusive— is abusive "because of" Plaintiffs' disabilities or age and not "because of" the inherent difficulties

encountered by an underfunded public school district.  Accordingly, this Court dismisses with prejudice Plaintiffs' hostile work environment claims.

**VI.    Duffy's NYSHRL Claim**

New York Education Law § 3813(1) requires that plaintiffs file a notice of claim prior to any action against a school district or its officers.  N.Y. Educ. Law § 3813(1).

> The term "school officer" means a clerk, collector, or treasurer of any school district; a trustee; a member of a board of education or other body in control of the schools by whatever name known in a union free school district, central school district, central high school district, or in a city school district; a superintendent of schools; a district superintendent; a supervisor of attendance or attendance officer; or other elective or appointive officer in a school  district whose duties generally relate to the administration of affairs connected with the public school system.

N.Y. C.L.S. Educ. § 2(13).  Principals are excluded from the statute.  *Mauro v. N.Y.C. Dep't of Educ.*, 19-CV-04372 (GBD) (KHP), 2020 WL 5899522, at *4 (S.D.N.Y. Apr. 29, 2020).  The notice must be filed within three months of the accrual of the claim.  N.Y. Educ.  Law § 3813(1). These requirements are "construed strictly," so "failure to abide by their terms mandates dismissal of the action."  *Smith v. N.Y.C. Dep't of Educ.*, 808 F. Supp. 2d 569, 578 (S.D.N.Y. 2011).  This requirement applies to claims brought under the NYSHRL.  *See Nelson v. Mount Vernon City Sch. Dist.*, No. 15-CV-8276 (KMK), 2017 WL 1102668, at *3 (S.D.N.Y. Mar. 23, 2017) ("NYSHRL claims that are brought against a school district, board of education, or school officer are subject to the notice of claim requirements contained in New York Education Law § 3813(1)." (internal quotation marks omitted)).

However, an EEOC charge may satisfy the requirements of Section 3813 so long as the EEOC charge: "(1) places the school district on notice of the precise claims alleged; and (2) is served on the party required by [S]ection 3813 within the statutory time period."  *Richard v. N.Y.C. Dep't of Educ.*, 16-CV-957 (MKB), 2017 WL 1232498, at *21 (E.D.N.Y. Mar. 31, 2017).

Here, while Duffy filed a charge of discrimination with the EEOC on January 23, 2020

(Am. Compl. ¶ 144), Duffy again includes no allegations regarding whether the notice contained the precise claims alleged, or whether it was served on Defendants.  Therefore, this claim is dismissed with prejudice as to the school and its officers, including Defendants Hamilton and Gagne-Kurpiewski.  *See, e.g., Harrison v. Traylor*, No. 17 CIV. 6678 (NSR), 2022 WL 580773, at *3–4 (S.D.N.Y. Feb. 25, 2022) (citing *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999)) (dismissing plaintiff's claim where prior opinion dismissed claim and amended complaint did not cure deficiencies identified by the court).

The NYSHRL allows for individual liability under two theories: where the individual defendant is considered an "employer" of the plaintiff, or where the individual defendant aided and abetted the unlawful discriminatory acts of others.  N.Y. Exec. Law § 296(1), (6); *see also Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521–22 (S.D.N.Y. 2015) (discussing the two theories of individual liability under the NYSHRL).  An "employer" under Section 296(1) "has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others."  *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (internal quotation marks omitted).

Meanwhile, the aiding and abetting provision makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."  N.Y. Exec. Law § 296(6).  An individual may be liable for aiding and abetting unlawful discriminatory acts if the individual "actually participates in the conduct giving rise to a discrimination claim," even though that individual lacked the authority to hire or fire the plaintiff. *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).

Here, as observed by this Court in the First Opinion & Order (First Opinion & Order at 29), Duffy has not plausibly alleged that any of the individual Defendants are "employers" under the NYSHRL, as "Section 2554(2) of New York Education Law vests the Board of Education with

30

the power to appoint a superintendent, principals, and teachers, among other employees and personnel." *Miotto v. Yonkers Pub. Schs.*, 534 F. Supp. 2d 422, 427–28 (S.D.N.Y. 2008) ("Defendants, as superintendent and principal within the District, do not have the power to hire or fire a teacher. Even though they have supervisory positions, and may advise the Board of Education in its personnel decisions of, that is not enough to hold them liable under § 296(1).").

Nor does Duffy allege that any of the individual Defendants aided or abetted discriminatory acts in violation of the NYSHRL. At the outset, Duffy has not properly established predicate liability against the District for hostile work environment or retaliation, *see supra*, and thus he cannot sustain these claims against the individual Defendants. *See Falchenberq v. N.Y. State Dep't. of Educ.*, 338 F. App'x. 11, 14 (2d Cir. 2009) ("Aiding and abetting is only a viable theory where an underlying violation has taken place."). To the extent Duffy has properly established predicate liability against the District, he has done so for denials of reasonable accommodation requests in September 2019, 2020, and 2021, involving Principal Dweck, Principal Green, Assistant Principal Albins, and Assistant Principal Newbey. None of these individuals are defendants in the present matter. And more importantly, none of the current Defendants were alleged to have any involvement in the denial of these accommodation requests. As such, Duffy's NYSHRL claims are dismissed with prejudice against all Defendants.

## CONCLUSION

Defendants' motion to dismiss is GRANTED in part and DENIED in part.

The following of Plaintiffs' claims are dismissed with prejudice: (1) any discrimination or retaliation claims arising out of allegations that took place prior to June 5, 2018, for Santana, and April 1, 2019, for Duffy; (2) **Santana and Duffy's ADEA discrimination claims**; (3) Duffy's retaliation claims; (4) Santana and Duffy's hostile work environment claims; and (5) Duffy's

31

NYSHRL claims.  The following of Plaintiffs' claims are dismissed without prejudice: Duffy's discrimination claims arising out of pandemic-related accommodation requests.

The following of Plaintiffs' claims may proceed: (1) Santana's ADA discrimination claims (with exception of those arising out of allegations that took place prior to June 5, 2018); (2) Santana's retaliation claims; and (3) Duffy's **ADA** discrimination claims related to the denial of his reasonable accommodation requests in September 2019, 2020, and 2021 (to the extent these requests do not entail pandemic-related requests).[2]

Defendants are directed to answer the Amended Complaint by May 2, 2023.  The Court waives the Initial Pre-Trial Conference and directs the parties to submit a Case Management Plan and Scheduling Order (blank form attached hereto) by May 16, 2023.  After review and approval of the Scheduling Order, the Court will issue an Order of Reference to Magistrate Judge Paul E. Davison for general pretrial purposes.  The parties are directed to contact Judge Davison within seven (7) business days of the date of the Order of Reference to schedule a conference.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 54.

SO ORDERED.

Dated:    April 7, 2023
          White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge

---

[2] The bolded and underlined language in the "Conclusion" section denotes the only changes made to the Court's Second Opinion and Order, dated March 31, 2023 (ECF No. 61).