USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/18/2025___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAY SANTANA and BRENDAN DUFFY,

        Plaintiffs,

   -against-

MOUNT VERNON CITY SCHOOL
DISTRICT/BOARD OF EDUCATION,

        Defendants.

No. 20-CV-03212 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

  Plaintiffs Raymond Santana ("Santana") and Brendan Duffy ("Duffy" and, together with Santana, "Plaintiffs") initiated this action on April 23, 2020, alleging violations of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act, and N.Y. Executive Law § 296 ("NYSHRL"). Only Plaintiffs' ADA and NYSHRL claims against Defendants Mount Vernon City School District/Board of Education (collectivity the "Defendants") remain, which the Court now addresses.

  Presently before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56 (ECF No. 113.) For the following reasons, Defendants' motion is GRANTED.

**FACTUAL BACKGROUND**

  Plaintiffs and Defendants submitted briefs, statements of material fact pursuant to Local Rule 56.1, responses to the opposing statements of material fact, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background.

**I. Plaintiff Santana**

1

Santana is classified as a Vietnam war veteran.  (ECF No. 119, "Pls.' Counter 56.1," ¶ 113.)  During his time with the military, Santana was diagnosed by the U.S. Department of Veterans Affairs with dysthymic disorder.  (*Id*. ¶ 195.)

Sometime after concluding his military service, Santana became a teacher.  Santana obtained teaching certificates in (1) Pre-Kindergarten, Kindergarten, and Grades 1–6; (2) Special Education; and (3) School Media Specialist (Educational Communications).  (ECF No. 114, "Defs.' 56.1," ¶ 2.)  Relevant here, Santana received his School Media Specialist (Educational Communications) certificate on February 1, 2004.  (*Id*.)  Santana does not possess a Library Media Specialist certificate.  (*Id*. ¶ 4.)  Santana claims, however, that the New York State Education Department informed him that he could work as a Librarian with his School Media Specialist certification.  (Pls.' Counter 56.1 ¶ 4.)  Santana was also told that his School Media Specialist certification and the Library Media Specialist certification were "one and the same" prior to a realignment of certifications in February 2004.  (*Id*. ¶ 5.)  Nevertheless, 8 N.Y.C.R.R. 30-1.8(b)(5)-(6) prescribes that certification as a School Media Specialist (Educational Communications) and School Media Specialist (Library) are two different certifications.  (Defs.' 56.1 ¶ 5.)

### a.  Santana's Employment in the District

Santana began his teaching career as a Technology Teacher in the Mount Vernon City School District (the "District").  (*Id*. at ¶ 8.)  Due to budget cuts, and eventual discharge, Santana was appointed as a Special Education Teacher for the 2006–2007 school year.  (*Id*. at ¶¶ 12–14.)  Santana became tenured in this position on September 1, 2008. (*Id*. at ¶ 16.)  On December 8, 2011, one of Santana's students kicked him in the knee.  (Pls.' Counter 56.1 ¶ 192.)  According to Santana, the student was "a little bit highly functioning."  (*Id*. ¶ 54.)  As a result of this injury, Santana would eventually require several surgeries, which are discussed in more detail below.  (*Id*.)

Five years later, Santana was appointed to a probationary School Media Specialist (Educational Communications) position at Mandela/Zollicoffer High School on September 16, 2016.  (Defs.' 56.1 ¶ 17.)  In this position, Santana claims he worked and was evaluated as a Librarian.  (Pls.' Counter 56.1 ¶ 17.)  The probationary period for this position was through August 31, 2019.  (Defs.' 56.1 ¶ 18.)  On March 23, 2017, Santana applied for a "School Media Specialist/Librarian" position.  (*Id*. ¶ 20.)  The District denied Santana's application, however, because his certification as a School Media Specialist (Educational Communications) did not qualify him to be a Library Media Specialist.  (*Id*. ¶¶ 21–22.)  The District requires Library Media Specialists to have New York State certification as either a Library Media Specialist or School Media Specialist (Library).  (*Id*. ¶ 26.)  Santana has neither.  (*Id*. ¶ 2.)  In or around June 2017, Santana applied for a supplementary certificate as a Library Media Specialist through the New York State TEACH system.  (*Id*. ¶ 23.)  Santana's application was similarly rejected because he lacked the requirements to obtain the certification.  (*Id*. ¶¶ 24–25.)

During the 2017–2018 school year, the Mandela/Zollicoffer High School reduced its headcount due to budget cuts.  (*Id*. ¶ 19.)  Santana was therefore reassigned to teach at Mt. Vernon High School as a Special Education Teacher on May 4, 2017.  (*Id*. ¶ 27.)  The District's job description for a Special Education Teacher included, among other things, "[f]acilitat[ing] the learning activities of exceptional students (Students with Specific Learning Challenges, Speech/Language Impairments, Intellectually Delayed, Emotional Disturbance, Other Health Impairments, Autism, Hearing Impairments, Orthopedic Impairments, Visual Impairments and Traumatic Brain Injury)."  (*Id*. ¶ 28.)

### i. The 2018–2019 School Year[1]

Santana underwent left knee replacement surgery on November 8, 2018. (Pls.' Counter 56.1 ¶ 199.) Although it is unclear from the record, Santana was required to use crutches while recovering. (Santana Decl. ¶ 12.)

Upon returning to teaching, Santana began requesting accommodations relating to his medical conditions. (Defs.' 56.1 ¶ 32.) In connection with his dysthymic disorder, on or around March 11, 2019, Santana requested for "additional time for reports, voice to text assistance, [a] quiet area during authorized break[s], and supportive staff when available." (*Id*. ¶ 33.) In connection with his knee injury, on or around March 14, 2019, Santana requested for "no stair climbing," permission to "re-position every 10–15 minutes," "no prolonged sitting or standing," "ergonomic seating," and permission to use a "cane for ambulation." (*Id*. ¶ 35.) Santana provided a doctor's note supporting these accommodation requests. (*Id*. ¶ 40.) The doctor's note, however, did not mention Santana's March 11, 2019 accommodation request. (*Id*.) On or about April 1, 2019, Santana filed discrimination charges with the New York State Division of Human Rights ("DHR") and U.S. Equal Employment Opportunity Commission ("EEOC") alleging disability and age discrimination and retaliation. (Santana Decl. ¶ 14.) Santana also renewed his accommodation requests on April 10, 2019. (*Id*. ¶¶ 41–44.)

The District denied most of Santana's accommodation requests on May 29, 2019. (*Id*. ¶¶ 45–47.) In response to Santana's "no stair climbing" request, the District informed him to use the elevator. (*Id*. ¶ 46.) Santana believed this to be an unreasonable accommodation because the elevator allegedly (1) lacked an inspection certificate; (2) was prone to not working; and (3) was

---

[1] Throughout the 2018–2021 school years, Santana was absent for extended period of times due to medical procedures, treatment, and recovery. (Pls.' Counter 56.1 ¶ 96.) According to Santana, most absences occurred under his workers' compensation. (*Id*.)

located at the extreme end of the school. (Pls.' Counter 56.1 ¶¶ 204–05.) However, Santana has never been trapped in the elevator, never witnessed anyone trapped in the elevator, nor has he been trapped on a floor due to the elevator malfunctioning. (Defs.' 56.1 ¶¶ 93–95.) The District also informed Santana that he was in control of his own physical movements and thus did not need to submit an accommodation request for "no prolonged sitting or standing," permission to "re-position every 10–15 minutes," and permission to use a cane to ambulate. (*Id*. ¶ 47.) The District did approve Santana's request for an ergonomic chair. (*Id*. ¶ 45.) Santana also believed this to be an unreasonable accommodation because he was only permitted to purchase one chair despite teaching in several classrooms. (Pls.' Counter 56.1 ¶ 45.) As discussed in more detail below, the chair eventually went missing during the coronavirus shutdown. (*Id*.)

### ii. The 2019–2020 School Year

Sometime during the 2019–2020 year, Santana underwent left hip replacement surgery. (*Id*. ¶ 207.)

At the beginning of the school year, Santana was assigned to teach higher functioning students with special educational needs on the first floor. (*Id*. ¶ 208.) Sometime thereafter, Santana received a revised schedule, assigning him to teach lower functioning students with special educational needs and alternative education students. (*Id*. ¶ 209.) Santana was also assigned to the "Sundown Academy," which is a program for high school students who are over-aged and under-credited, meaning that the students have been in school for several years but have not accrued enough credits to move from one grade level to the next. (ECF No. 117, Ex. 2, "Defs.' Response 56.1," ¶ 216.) A student's need for special education services or their behavioral "stability" are not requirements for this over-aged/under-credited program. (*Id*.) According to Santana, these students were known to have behavioral issues. (Pls.' Counter 56.1 ¶ 216.)

On September 23, 2019, and October 9, 2019, Santana requested to "be placed with students with stable behavior outlooks" that were "higher functioning." (Defs.' 56.1 ¶¶ 49, 52.) Santana also provided doctor's notes stating that he should be "placed with students with stable behavior outlooks to reduce his risk of additional injury." (Pls.' Counter 56.1 ¶¶ 212–13.) Santana requested this accommodation because he was already injured by students on two different occasions—including the December 8, 2011 incident. (Defs.' 56.1 ¶ 51.) The District nevertheless denied Santana's request and informed him that working with students of varying levels and needs for behavioral support is an essential function of a Special Education Teacher. (*Id*. ¶¶ 50, 55.)

Santana also renewed his previous accommodation requests in his September 23, 2019, and October 9, 2019 requests, including "no stair climbing," avoiding prolonged sitting and standing, permission to reposition himself every 10–15 minutes, a cane, and an ergonomic chair. (*Id*. ¶¶ 64–73.) The District gave the same responses as before. (*Id*.) The District informed Santana that he could use the elevator to avoid "stair climbing," was in control of his own physical movements, could receive a prescription and purchase a cane, and would be provided an ergonomic chair of his choosing. (*Id*.) Santana eventually selected an ergonomic chair on November 19, 2019, and indicated that he would order three of them to accommodate the several classrooms he taught in. (*Id*. ¶ 73; Pls.' Counter 56.1 ¶ 73.)

On December 27, 2019, Santana again requested accommodations for "no stair climbing," no prolonged sitting or standing, permission to reposition every 10–15 minutes, ergonomic seating, and permission to use a cane. (Defs.' 56.1 ¶ 76.)

### iii. The 2021–2022 School Year

Due to the coronavirus pandemic, all teachers worked remotely for the 2020–2021 school year. (*Id*. ¶ 78.) During this time, on June 26, 2020, Santana applied for another Library Media

Specialist position. (*Id*. ¶ 30.) Associate Superintendent for Human Resources, Marci Tiggs, informed Santana that his application was rejected because he did not have the proper certification. (*Id*. ¶ 31.)

On or about April 12, 2021, Santana emailed his supervisor that he was scheduled to have his left knee replaced. (Pls.' Counter 56.1 ¶ 218.) Although Santana emailed his supervisor about his knee replacement, he failed to email the District's human resources department about his surgery and subsequent absence from work. (Defs.' 56.1 ¶ 98.) The District's human resources department eventually contacted Santana requesting information from his medical provider to determine if his surgery was medically necessary, the length of recovery, and information as to how the surgery was related to Santana's injury from December 8, 2011. (*Id*. ¶ 100.) On April 15, 2021, Santana responded by stating he could not provide the requested information because he retained counsel. (*Id*. ¶ 101.) The District responded the same day, however, notifying Santana that this information was required to substantiate his need of absence from work. (*Id*. ¶ 104.) Shortly thereafter, Santana claims that the District ceased paying him and informed him that he ran out of sick days. (Pls.' Counter 56.1 ¶ 219.) The District followed up with Santana requesting information concerning his knee replacement on May 19, 2021. (Defs. 56.1 ¶ 105.) Because Santana failed to provide this information, the District ultimately considered his absence from work to be insubordination. (*Id*. ¶ 106.)

Upon returning to work, Santana began submitting additional accommodation requests on July 25 and August 2, 2021. (*Id*. ¶ 80.) Santana again requested for "no stair climbing," an ergonomic chair, "no prolonged sitting or standing," permission to "re-position every 10–15 minutes," permission to use a cane to ambulate, placement with "students with stable behavior outlooks," "additional time for reports," "voice-to-text assistance," a "quiet area during authorized

break[s]," and "supportive staff when available." (*Id.*) Santana also provided a doctor's note acknowledging that the "additional time for reports," "voice-to-text assistance," a "quiet area during authorized break," and "supportive staff when available" accommodations were not medically related to Santana's injury. (*Id.* ¶ 81.) It was also around this time that Santana's ergonomic chair when missing. (*Id.* ¶ 82.)

The District responded to Santana's accommodation requests on September 2, 2021. (*Id.* ¶ 84.) The District first informed Santana that his request for "no stair climbing" was moot because all his classes were on the ground floor. (*Id.* ¶ 85.) The District again instructed Santana to use the elevator. (*Id.*) The District next informed Santana that he already received an ergonomic chair and that he needs to contact custodial staff to locate it. (*Id.* ¶¶ 87–88.) The District again informed Santana that he was in control of his own physical movements, so he did not need to submit a request for "no prolonged sitting or standing," permission to "re-position every 10-15 minutes," and permission to use a cane. (*Id.* ¶ 90.) The District also reminded Santana that teaching students with behavioral issues was an "essential aspect" of his job. (*Id.* ¶ 91.) Finally, the District determined that Santana's requests for "additional time for reports, voice-to-text assistance, a quiet area during an authorized break and supportive staff when available" were not "medically related" to his medical conditions and therefore denied them. (*Id.* ¶ 92.)

## II.    Plaintiff Brendan Duffy

Duffy holds a bachelor's degree in computer science and a permanent teaching certificate in Mathematics, Grades 7–12. (*Id.* ¶¶ 115–16.) For approximately twenty years, Duffy has resided in an apartment building where he lives on the second floor. (*Id.* ¶¶ 173–75.) To reach his apartment, Duffy uses an elevator. (*Id.* ¶ 176.) Duffy feels safe using his apartment building's elevator because it has a certificate of inspection. (Pls.' Counter 56.1 ¶ 176.) However, Duffy

does not have an evacuation plan in place for his residence in the event of a fire or emergency. (Defs.' 56.1 ¶ 177.)  Nor has Duffy ever been stuck in an elevator.  (*Id*. ¶ 178.)

### a.  Duffy's Employment in the District

#### i.  2005–2019 School Years

Duffy has been employed by the District since 2005.  (*Id*. ¶ 118.)  From September 2005 through June 2012, Duffy taught Grades 9–12 Math at Mt. Vernon High School.  (*Id*. ¶ 119.)  On September 1, 2010, Duffy submitted a doctor's note requesting an accommodation for a ground floor classroom.  (Pls.' Counter 56.1 ¶ 222.)  Duffy thereby only worked on the ground floor during the 2010–2012 school years.  (*Id*. ¶ 223.)  Sometime in 2010, Duffy underwent arthroscopic meniscus to repair a right knee injury.  (Duffy Decl., Ex. A.)

In September 2012, Duffy was transferred to A.B. Davis Middle School, where he taught Grades 7–8 Math.  (Defs.' 56.1 ¶ 120.)  At some point, two students assaulted Duffy in his classroom, resulting in permanent injuries to his knees and neck.  (Pls.' Counter 56.1 ¶ 225.)  Following this incident, Duffy claims he was permitted to work solely on the ground floor during the 2012–2014 school years.  (*Id*. ¶ 226.)

During the 2014–2015 school year, Duffy submitted a doctor's note stating that "[d]ue to his injuries he will need to be limited to the ground floor of the building because he cannot use the stairs."  (*Id*. ¶ 227.)  The District denied Duffy's request as unreasonable because "it would cause an undue hardship on the operation of the building to move all of [Duffy's] classes to the ground floor while the rest of the Grade 7 teacher team remains on the first floor," and would include, among other things, "moving approximately one hundred and twenty-five (125) students because no empty classrooms were available on the ground floor."  (Defs.' 56.1 ¶ 127.)  Despite being informed that he could use the elevator, Duffy claims this was not a reasonable accommodation

because the elevator had a history of not working properly and lacked a posted certificate of inspection. (Pls.' Counter 56.1 ¶¶ 230–31.) Duffy also claims to have once been trapped on the third floor of A.B. Davis Middle School due to the elevator malfunctioning. (*Id*. ¶ 229.)

At the end of the school year, Duffy was eventually transferred back to Mt. Vernon High School, where he worked from September 2015 through June 2019. (Defs.' 56.1 ¶ 121.) Upon his return, the current Principal of Mt. Vernon High School permitted Duffy to work solely on the ground floor. (*Id*. ¶ 132.) Duffy was also informed that all Mathematics Department meetings would be held in the Community Room to accommodate him. (*Id*. ¶ 131.)

### ii. The 2019–2020 School Year

Duffy was eventually transferred to Cecil H. Park School, a Kindergarten through Eighth Grade school, where he taught Grades 7–8 Math. (*Id*. ¶ 122.) Other than Duffy, there was only one other math teacher who taught Grades 7–8 Math. (Pls.' Counter 56.1 ¶ 123.)

During the 2019–2020 school year, Duffy was assigned to teach on the second floor. (Defs.' 56.1 ¶ 133.) After receiving this assignment, Duffy spoke with Cecil H. Parker School's Principal and requested a ground floor classroom. (*Id*. ¶ 134.) Duffy provided a doctor's note and informed the Principal that his medical records have been on file with the District since September 2010. (Pls.' Counter 56.1 ¶¶ 136, 236.) He did not, however, submit a formal request for accommodation like he did in 2014. (Defs.' 56.1 ¶ 136.) Duffy's request was denied, and he was directed to use the elevator. (*Id*. ¶ 135.) According to Duffy, the elevator was not a reasonable accommodation because the District failed to provide (1) a written evacuation plan to him in case of an emergency and (2) a certificate of inspection for the elevator. (Pls.' Counter 56.1 ¶ 135.)

Duffy also called out from work several times during the school year. Duffy first called out sick September 6, 23, and 24, 2019.[2] (Defs.' 56.1 ¶ 137.) Between October 7 to 17, 2019, Duffy called out for jury duty. (*Id.* ¶ 138.) Duffy next called out sick from October 25 through November 4, 2019. (*Id.* ¶ 139.) Despite returning to work between November 5 through November 19, 2019, Duffy eventually called out sick from November 17, 2019 through March 27, 2020. (*Id.* ¶¶ 139–40.) Duffy claims that he suffered from flareup injuries resulting from having to travel to several different classrooms throughout the school day. (Pls.' Counter 56.1 ¶ 141.) In March 2020, Cecil H. Park School shut down in-person instruction because of the coronavirus pandemic and instruction resumed thereafter remotely. (Defs.' 56.1 ¶ 142.)

### iii. The 2020–2021 School Year

At the beginning of the 2020–2021 school year, on September 2, 2020, Duffy notified Cecil H. Park School Interim Principal, Jackquline Green, that he had no personal computer device and no internet at home. (*Id.* ¶ 143.) Duffy also requested to be given a laptop and an internet hotspot so that he could teach remotely. (Pl. Counter 56.1 ¶ 143.) In response, Ms. Green directed Duffy to report in-person to work in the building so that he would have access to the technology required to instruct his students, who were learning remotely. (Defs.' 56.1 ¶ 144.) Duffy proceeded to work in-person on September 8 and 9, 2020. (*Id.* ¶ 145.) His classroom was on the second floor. (*Id.* ¶ 146.) Although Duffy did not submit a formal accommodation request, he submitted a doctor's note to Ms. Green and requested to teach only on the ground floor. (Pls.' Counter 56.1 ¶ 147.)

---

[2] Duffy claims that these and the subsequent absences from work were related to workers' compensation injuries. (Pls.' 56.1 ¶ 137.) Prior to 2017, the District purportedly permitted employees to select "workers' compensation" as a reason for being absent. (*Id.*) However, the District revised its policy at some point in 2017, forcing Duffy to select "sick day" when calling out from work. (*Id.*) Due to the District's revised policy, Duffy asserts that the District deducted sick days from his sick bank instead of marking them correctly in the teacher attendance records as workers' compensation absences. (*Id.* ¶ 240.)

Similar to the previous school year, Duffy began calling out from work.  Duffy first called

out sick on September 10, 11, and 14, 2020.  (Defs.' 56.1 ¶ 148.)  Despite returning on September

15, 2020, Duffy stopped reporting to work after September 16, 2020 because he contracted the

coronavirus.  (*Id*. ¶¶ 149–50.)  By letter dated October 19, 2020, and postmarked October 27, 2020,

Duffy informed the District that he "was stricken and afflicted with the China/Covid-19 virus" and

would be "pursuing this as a Worker's Compensation claim."  (*Id*. ¶ 151.)  This was the first time

Duffy informed the District of why he stopped reporting to work.  (*Id*. ¶ 152.)  Duffy asserts he

was too sick to inform them sooner.  (Pls.' Counter 56.1 ¶ 152.)

On March 21, 2021, Duffy emailed the District's human resources department advising

that he was cleared to return to work.  (Defs.' 56.1 ¶ 156.)  Duffy also provided a doctor's note

stating that he "must teach full-time from home remotely" due to inability to tolerate weaking a

face mask.  (*Id*. ¶ 157.)  The next day, Ms. Tiggs informed Duffy that despite submitting a doctor's

note, he must also submit a formal accommodation request.  (*Id*. ¶ 158.)  Duffy supposedly never

received this email because he did not have access to his work email from September 1, 2019

through August 31, 2024.  (Pls.' Counter 56.1 ¶ 158.)

On May 14, 2021, Duffy mailed a letter, dated March 21, 2021, to Ms. Green and requested

that she "mail" him a "laptop computer and an internet hotspot."  (Defs.' 56.1 ¶ 160.)  In response,

Ms. Tiggs sent a letter to Duffy on May 19, 2021, informing him to submit a formal

accommodation request form.  (*Id*. ¶ 161.)  Duffy again asserts that he did not receive this letter

due to not having access to his work email.  (Pls.' Counter 56.1 ¶ 161.)  Eventually, Duffy

submitted a formal accommodation request seeking a laptop and an internet hotspot.  (Defs.' 56.1

¶ 162.)  The request also included a doctor's note stating that Duffy required to work remotely due

to "persistent post-COVID-19 symptoms of fatigue, shortness of breath and joint pain."  (Pls.'
Counter 56.1 ¶ 163.)

Duffy remained out of work for the remainder of the 2020–2021 school year because he
had "long COVID."  (Defs.' 56.1 ¶ 154.)

### iv.  The 2021–2022 School Year

The District eventually denied Duffy's request to work remotely on August 4, 2021.  (*Id*. ¶
166.)  Duffy's request was denied because the District required all teachers to return to in-person
teaching.  (*Id*. ¶ 167.)  The District also noted that teachers did not receive internet hotspots.  (Defs.'
56.1 ¶ 164.)  However, Duffy claims that Ms. Green verbally informed him that Cecil H. Park
School provided teachers with laptops and hotspots.  (Pls.' Counter 56.1 ¶ 164.)  The District did
inform Duffy that they would provide him with personal protective equipment.  (*Id*. ¶ 168.)  The
District also promised enhanced and increased cleaning and sanitation of highly touched surfaces.
(*Id*.)

With his remote work accommodation request being denied, Duffy submitted an
accommodation requesting a mask exemption.  (*Id*. ¶ 170.)  Duffy, however, did not submit a
formal accommodation request and only submitted a doctor's note.  (*Id*. ¶¶ 169–70.)  Duffy
reported in-person to work for three days during the 2021–2022 school year—September 1, 2, and
9, 2019.  (*Id*. ¶ 171; Pls.' Counter 56.1 ¶ 171.)  For two of those days, no students were present in
the school.  (Defs. 56.1 ¶ 172.)  Thereafter, Duffy ceased reporting to work for the remainder of
the 2021–2022 school year.  (*Id*. ¶ 173.)

### PROCEDURAL HISTORY

On April 23, 2020, Plaintiffs commenced this action against Defendants.  (ECF No. 1.)  On
April 21, 2025, Defendants filed their Motion for Summary Judgment, along with their

memorandum of law in support and Rule 56.1 Statement of Undisputed Material Facts. (ECF Nos. 113–15.)  Plaintiffs opposed Defendants' motion for Summary Judgment and filed a Counterstatement to Defendants' Rule 56.1 Statement of Undisputed Material Facts. (ECF Nos. 119, 125.)  Defendants filed a reply memorandum in further support of their motion. (ECF No. 117).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). "A fact is material if it might affect the outcome of the suit under the governing law," and it is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  When the moving party has asserted facts establishing that it is entitled to judgment, the opposing party must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited [by the movant] do not establish the absence… of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  The Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

Plaintiffs' ADA claims are analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013).  Under that familiar framework, "a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's

14

reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).

## DISCUSSION

Following the Court's decision on Defendants' Motion to Dismiss the Second Amended Complaint, only three claims remain at issue: (1) Santana's ADA discrimination claims arising after June 5, 2018; (2) Duffy's ADA discrimination claims related to the denial of accommodation requests in September 2019, 2020, and 2021 (to the extent these requests did not entail pandemic-related requests); and (3) Santana's ADA and NYSHRL retaliation claims. (ECF No. 63.) The Court now addresses each claim in turn.

### I.    Plaintiffs' ADA Discrimination Claims

The ADA requires an employer to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," and the failure to do so constitutes impermissible discrimination. 42 U.S.C. § 12112(b)(5)(A). This requirement only applies to persons with an actual, as opposed to a perceived, disability. 42 U.S.C. § 12201(h). To make a *prima facie* showing of a failure to provide reasonable accommodation under the *McDonnell-Douglas* burden shifting framework applicable to employment discrimination claims, a plaintiff must prove that (1) he is a person with a disability under the meaning of the statute; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodations he could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations. *Williams v. Geiger*, 447 F. Supp. 3d 68, 79–80 (S.D.N.Y. 2020) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)).

### a.   Whether Plaintiffs are Qualified Individuals with a Disability

To be a "qualified individual" under the ADA, a plaintiff must establish two elements: (1) that they have a physical or mental impairment; and (2) that this impairment substantially limits one or more major life activities. *Fishman v. City of New Rochelle*, 2025 WL 268613, at *2 (S.D.N.Y. Jan. 22, 2025) (citing *Schwartz v. Comex*, 1997 WL 187353, *2 (S.D.N.Y. Apr. 15, 1997)). Major life activities are "activities that are of central importance to daily life… [including] functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002); 29 C.F.R. § 1630.2(i)).

### i. Plaintiffs' Mobility Conditions

Defendants assert they are entitled to summary judgment because Plaintiffs fail to establish that they are qualified individuals with a disability under the ADA. (ECF No. 115, "Defs.' Mot." at 15–17.) Defendants first argue that Plaintiffs' mobility conditions preventing them from climbing stairs does not qualify as a major life activity under the ADA. (*Id*. at 16.)

The Second Circuit appears conflicted in deciding whether stair climbing qualifies as a major life activity. Most courts have determined that stair climbing does not qualify as a major life activity. *See, e.g.*, *Rogers v. City of New York*, 359 F. App'x 201, 203 (2d Cir. 2009) ("an inability to climb stairs… is not a substantial limitation of a major life activity so as to render [plaintiff's] disabled under the ADA"); *Addoo v. New York City Bd. of Educ.*, 2006 WL 5838977, at *6 (E.D.N.Y. Dec. 18, 2006) ("climbing stairs is not significant enough to fall within the short list of functions that constitute major life activities."); *Missick v. City of New York*, 707 F. Supp. 2d 336, 352 (E.D.N.Y. 2010) (plaintiff's inability to climb stairs fails to "demonstrate that she suffers from an ADA-cognizable disability"). A minority of courts disagree. *See, e.g.*, *Sussle v.*

*Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 299 (S.D.N.Y. 2003) (stating, without explanation, that "[t]he Court finds that climbing stairs qualifies as a major life activity"); *Nodelman v. Gruner & Jahr USA Pub.,* 2000 WL 502858, at *7 (S.D.N.Y. Apr. 26, 2000) (same).

This Court agrees that stair climbing is not significant enough to fall within the short list of functions that constitute major life activities. In situations not dissimilar from the instant case, Second Circuit courts have adopted this view in the context of teachers requesting ground floor classroom accommodations due to an inability to climb stairs. Most notably, in *Addoo v. New York City Bd. of Educ.*, a substitute teacher injured her legs when tripping and falling in the school's playground. 2006 WL 5838977, at *2. The substitute teacher was eventually diagnosed with "contusion of the leg"—an injury that occurs when a blunt force impacts the soft tissues of the leg—and had difficulty walking and climbing stairs. *Id*. Due to her injuries, the substitute teacher submitted doctor's notes requesting that she "decrease the amount of stair climbing at work." *Id*. Despite the substitute teacher claiming that she was discriminated against for being "transferred from the first floor to the basement level subsequent to the accident and her requests for accommodation… not being honored," the *Addoo* court granted defendants' summary judgment with respect to her ADA discrimination claims because "climbing stairs is not significant enough to fall within the short list of functions that constitute major life activities." *Id*. at *2, *6.

Beginning with Santana's discrimination claims, it is undisputed that during the 2019–2022 school years, he submitted several accommodation requests for "no stair climbing." (*See* Santana Decl., Exs. B–H.) It is also undisputed that Santana submitted doctor's notes requesting "no stair climbing" accommodations. (*See* Santana Decl., Exs. D–F.) These doctor's notes make general references to Santana's "work-related injuries" and various knee and hip procedures. (*Id*.) However, Santana fails to provide "sworn testimony from a medical professional opining on the

severity of [his] condition." *Addoo*, 2006 WL 5838977, at *8.  Indeed, Santana largely relies on his own deposition and declaration testimony to demonstrate that his condition should be considered severe when compared to the average person's ability to climb stairs.  (*See, e.g.*, Santana Decl. ¶¶ 2, 12.)  While Santana's doctor's notes might support his allegations, they are nevertheless no means of gauging the severity of his mobile condition.  *See Sussle*, 269 F.Supp.2d at 301–02 (plaintiff's testimony alone, without supporting medical testimony, is insufficient to create a material issue of fact as to whether there are substantial limitations on a major life activity); *Missick*, 707 F. Supp. 2d at 352 (teacher's "difficulty in climbing stairs without fatiguing,… even if adequately supported by admissible corroborating evidence (which is not the case here…), has consistently been rejected as failing to implicate a major life activity for ADA purposes").

Duffy's discrimination claims fare no better.  Prior to the 2019–2020 school year, Duffy submitted three doctor's notes requesting ground floor classrooms because of his "partial medial meniscectomy" and "bilateral knee pain."  (*See* Duffy Decl., Exs. A, C–D.)  However, all of Duffy's doctor's notes submitted thereafter only refer to his "inability to tolerate wearing a mask" and working remotely due to the coronavirus.  (*See* Duffy Decl., Exs. I–J.)  As discussed above, the Court will not consider any of Duffy's ADA discrimination claims pertaining to pandemic-related requests.  (ECF No. 63.)  Moreover, while Duffy provides his deposition and declaration testimony in support of his mobility condition, he nevertheless fails to provide sworn testimony from a medical professional.  *See Addoo*, 2006 WL 5838977, at *8.  Indeed, Duffy "relies solely on his own testimony and fails to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his condition… [and thus] cannot establish that he is disabled within the meaning of the ADA."  *Sussle*, 269 F. Supp. 2d at 302.

Consequently, neither Santana nor Duffy present sufficient evidence to enable a reasonable jury to find that their mobility conditions constitute a disability under the ADA.[3]

### ii. Plaintiff Santana's Mental Condition

Defendants similarly assert that they are entitled to summary judgment because Santana fails to establish that his dysthymic disorder limited a major life activity.[4]  (Defs.' Mot. 16–17.) At some point during Santana's military service, he was diagnosed with dysthymic disorder. (Santana Decl. ¶¶ 2, 29).  In connection with Santana's dysthymic disorder, Plaintiffs argue that he submitted an accommodation request on March 11, 2019, asking for "additional time for reports, voice to text assistance, [a] quiet area during authorized break, and supportive staff when available."  (ECF No. 125, "Pls.' Opp." at 8; Santana Decl., Ex. B).  Plaintiffs also argue that Santana submitted a near identical accommodation request on August 2, 2021.  (Pls.' Opp. at 8; Santana Decl., Ex. H.)

Although Santana offers evidence that supports that he suffers from a mental impairment, he nevertheless fails to "provide evidence of a major life activity that has been impaired and [fails] to establish that the impairment represents a substantial limitation on that major life activity." *Bordeaux v. Halstead Prop. Dev. Mktg. LLC*, 2022 WL 484992, at *9 (S.D.N.Y. Feb. 16, 2022); *see also Robles v. Medisys Health Network, Inc.*, 2020 WL 3403191, at *6 (E.D.N.Y. June 19, 2020) ("A medical diagnosis, without more, establishes only that a plaintiff suffered an impairment, and not that his ability… was substantially limited by that impairment.").  Moreover, Plaintiffs cannot assert that Santana's accommodation requests implicate the major life activities

---

[3] A review of the undisputed facts also shows that, each time Plaintiffs requested "no stair climbing" or ground floor classroom accommodations, they were instructed and given the opportunity to use the elevator.  (*See, e.g.*, Defs.' 56.1 ¶¶ 46, 85, 127, 135.)

[4] Defendants also asserts that Plaintiffs failed to mention Santana's mental condition in the Amended Complaint. (Defs.' Mot. at 16.)  Albeit brief, the Amended Complaint does allege that "Santana has also been classified by the U.S. Verterans' Administration with dysthymic disorder."  (ECF No. 44 ¶ 19.)

of "learning, reading, concentrating, thinking, communicating, and working" when they provide no evidence in the record to support such a claim. (Pls.' Opp. at 8.) Indeed, Santana's own doctor acknowledged that Santana's request for "additional time for reports, voice to text assistance, [a] quiet area during authorized break, and supportive staff when available" were "[n]ot medical[ly] related." (Collins Decl., Ex. XX at Santana 0556–558.) Plaintiffs have thus failed to present evidence that Santana was substantially limited in any major life activity because "[t]he record contains only general accounts of the effects of [Santana's] depression, none of which demonstrate that [he] was 'unable' or 'significantly restricted' in his ability to perform the major life activities he identifies." *Matya v. Dexter Corp.*, 250 F. App'x 408, 409 (2d Cir. 2007); *see also Honeck v. Nicolock Paving Stones of New England, LLC*, 247 F. App'x 306, 308 (2d Cir. 2007) (affirming summary judgment where plaintiff "produced evidence that he suffer[ed] from depression, [but] has not shown that his depression substantially limits one or more of the major life activities' contemplated by the ADA").

To the extent Plaintiffs assert that Defendants failed to reasonably accommodate their disabilities, Plaintiffs' inability to establish that they are qualified individuals with a disability under the ADA is fatal to those claims. *See Sussle,* 269 F.Supp.2d at 312–13 (granting summary judgment on failure to accommodate disability claim where, as here, plaintiff cannot first demonstrate that she is an individual with a disability within the meaning of the statute in question). As such, Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' ADA discrimination claims.

## II.    Plaintiff Santana's Retaliation Claims

Finally, Defendants assert they are entitled to summary judgment because Santana fails to establish a *prima facie* case of retaliation. (Defs.' Mot. at 27.) Plaintiffs argue that the District

20

took adverse action against Santana after he requested accommodations, filed charges of discrimination with the DHR and EEOC, and commenced this lawsuit.  (Collins Decl., Ex. SSS ¶ 167; Pls.' Opp. 18–19.)

The burden-shifting framework under *McDonnell Douglas* applies to retaliation claims under both the ADA and the NYSHRL.  *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  To establish a *prima facie* case of retaliation, Santana must show that (1) he participated in an activity protected by the ADA; (2) his participation was known to Defendants; (3) Defendants subjected him to a material adverse action; and (4) a causal connection existed between the protected activity and the adverse action.  *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (analyzing an ADA retaliation claim) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (applying same elements to a retaliation claim under NYSHRL).

"If a plaintiff makes out a *prima facie* case of discrimination, the defendant must produce evidence supporting an explanation for the [adverse action] which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  *Samuels v. Urb. Assembly Charter Sch. for Computer Sci.*, 2025 WL 1785847, at *5 (S.D.N.Y. June 26, 2025) (quoting *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 132 (E.D.N.Y. 2023)).  If the employer proffers a legitimate, non-discriminatory reason for the adverse action, "the presumption of discrimination drops out of the picture, and the plaintiff bears the burden of demonstrating by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Cantres v. N.Y.P. Holdings, Inc.*, 2016 WL 5867046, at *4 (E.D.N.Y. Sept. 30, 2016).

As an initial matter, the Court finds that Santana engaged in protected activity when requesting accommodations for his medical conditions.  *See Dolac v. Cnty. of Erie*, 2021 WL 5267722, at *2 (2d Cir. Nov. 12, 2021) ("Requesting a reasonable accommodation for a disability constitutes a protected activity under the ADA.")  The Court similarly finds that Santana engaged in protected activity when filing charges of discrimination with the DHR and EEOC.  *See Okafor v. New York State Ins. Fund*, 2025 WL 2299172, at *15 (S.D.N.Y. Aug. 8, 2025) ("Filing… [a DHR] complaint constitutes participation in a protected activity."); *Melton v. Poughkeepsie City Sch. Dist.*, 2025 WL 2733658, at *6 (S.D.N.Y. Sept. 24, 2025) ("Plaintiff has filed an EEOC Charge… which constitutes a protected activity.")  It is also undisputed that the District was aware of Santana's accommodation requests and subsequent DHR and EEOC discrimination charges. (Santana Decl. ¶ 14.)

Santana, however, fails to establish that the District's denial of his accommodation requests constitutes an adverse action.  Santana alleges that the District began taking adverse actions against him after filing his DHR and EEOC discrimination charges on April 1, 2019.  (Santana Decl. ¶ 13.)  For instance, Santana claims that two months after filing his discrimination charges, he was forced to use the stairs to proctor an exam on the second floor of Mt. Vernon High School despite requesting an accommodation for "no stair climbing."  (Santana Decl. ¶ 15.)  Six months after filing his discrimination charges, Santana also alleges he received a revised schedule forcing him to teach students with unstable emotional behavioral issues despite requesting an accommodation to teach higher functioning students.[5]  (Santana Decl. ¶¶ 16, 20.)  The only alleged adverse actions

---

[5] Although Santana disputes that he did not receive a copy of the Special Education Teacher job description until March 12, 2023, he nevertheless does not dispute that one of the essential functions of a Special Education Teacher is to "[f]acilitate the learning activities of exceptional students (Students with ***Specific Learning Challenges***, Speech/Language Impairments, Intellectually Delayed, ***Emotional Disturbance***, Other Health Impairments, Autism, Hearing Impairments, Orthopedic Impairments, Visual Impairments and Traumatic Brain Injury).  (Defs. 56.1 ¶ 28) (emphasis added).  When determining whether an accommodation denial was reasonable, courts "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular

Santana can identify is the District denying his accommodations.  Nevertheless, the District's "alleged failure to accommodate [Santana's] disability subsequent to an ADA… protected request cannot be bootstrapped into a viable disability retaliation claim." *Morris v. Town of Islip*, 2014 WL 4700227, at *18 (E.D.N.Y. Sept. 22, 2014) (citing *Missick*, 707 F. Supp. 2d at 356–57; *see also Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023) (explaining that "a failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action in the disability discrimination context"); *Williams v. Dudley*, 2025 WL 2842286, at *5 (S.D.N.Y. Sept. 4, 2025), *report and recommendation adopted*, 2025 WL 2841137 (S.D.N.Y. Oct. 7, 2025) (same).

Santana's retaliation claims that occurred after commencing this action fare no better. Santana engaged in protected activity when initiating this lawsuit. *Stryker v. HSBC Sec. (USA)*, 2020 WL 5127461, at *12 (S.D.N.Y. Aug. 31, 2020).  Defendants were, of course, on notice of this lawsuit.  Although the parties dispute whether the District took adverse action, Santana cannot prove a causal connection because the adverse action occurred "more than a year after the alleged protected activity." *Akinde v. New York City Health & Hosp. Corp.*, 2022 WL 955442, at *12 (S.D.N.Y. Mar. 29, 2022).  Indeed, Plaintiffs commenced this action on April 23, 2020.  (ECF No. 1.)  Meanwhile, Plaintiffs allege that the District began taking adverse action against Santana starting in April 2021—a full year later.  (Pls.' Opp. at 19.)  "That temporal gap is too attenuated to support a causal inference." *Akinde*, 2022 WL 955442, at *12; *see also D'Alessio v. Charter Commc'ns, LLC*, 2020 WL 5638721, at *7 (E.D.N.Y. Sept. 21, 2020) ("[A] temporal gap of over

---

position… [and] may consider as evidence job descriptions." *Frantti v. New York*, 850 F. App'x 17, 20 (2d Cir. 2021) (citing *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003); *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120-21 (2d Cir. 2004)).

a year is too attenuated to support a causal inference."); *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (same).

Santana has thus failed to establish a *prima facie* case of retaliation because he cannot provide material evidence demonstrating that the District took adverse action against him. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiffs' ADA retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The Court respectfully directs the Clerk of Court to enter judgment in favor of Defendants and close this case.

SO ORDERED.

Dated: November 18, 2025
      White Plains, NY

_____
Nelson S. Román, U.S.D.J.